1

2

3



CV 01-05124 #00000055

7

8

Honorable Robert Bryan

9

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

10

11

| | |
|---|---|
| JOHN S TEMPLE, | NO  C01-5124 |
| Plaintiff, | **DEFENDANT ALLSTATE'S MOTION FOR SUMMARY JUDGMENT** |
| v | |
| ALLSTATE INSURANCE COMPANY, a foreign corporation, | **NOTE FOR MOTION: SEPTEMBER 13, 2002** |
| Defendant | |

12

13

14

15

16

17

## I. **INTRODUCTION**

18

In this lawsuit, Plaintiff John Stephen Temple ("Plaintiff" or "Temple")

19

challenges virtually every aspect of his employment with Allstate Insurance

20

Company ("Allstate") beginning in the fall of 1998   he claims that Allstate

21

misclassified him as an exempt employee and failed to pay him overtime, he claims

22

that he had a disability and that Allstate failed to accommodate that disability when

23

it insisted that he keep his office open during required hours, he claims that

24

management harassed and retaliated against him, and he claims that Allstate's

25

decisions to end its employee agent program and to require a waiver as a condition

26

of the terminated agents' receipt of certain enhanced benefits were retaliatory and

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 1
291/320177 02
082002/1237/42496 00103



Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   had a disparate impact on agents like Temple   From the discovery motions

2   previously filed with the court, Temple's strategy is clear   through his "shotgun"

3   approach to litigation, and inflammatory statements designed to generate sympathy

4   for himself, he hopes to distract the Court from focusing on the legal standards he

5   must meet   However, rhetoric, vague assertions, and appeals for sympathy are not

6   sufficient to avoid summary judgment   To survive summary judgment Temple must

7   produce credible, admissible evidence showing that Allstate acted unlawfully under

8   one or more of the legal causes of action pled in his Second Amended Complaint

9   He cannot meet that burden   While Allstate concedes that there are many facts in

10  dispute, there are no genuine issues of material fact that would allow a jury to find in

11  favor of Temple under any theory of law   Consequently, Allstate is entitled to

12  summary judgment

## II. STATEMENT OF RELEVANT FACTS

14      At all relevant times, Allstate has marketed insurance through a network of

15  agents working in various locations throughout the country   (Declaration of Barry

16  Hutton ("Hutton Decl ") ¶ 4 )  Although Allstate has traditionally relied primarily on

17  agents who have sold Allstate products exclusively, the structure of the agent

18  network has changed significantly over the years   (Id )  Prior to June 30, 2000,

19  when the changes at issue in the lawsuit occurred, Allstate's agency workforce had

20  evolved into six different programs with 11 different contract/ administrative

21  requirements   (Id )

22      Plaintiff was employed by Allstate as an employee agent from August 1987

23  through June 30, 2000   (Deposition of John S  Temple ("Temple Dep ") at 31 5-

24  32 13 )[1]   Throughout most of his employment, Temple worked as a "Neighborhood

---

[1] Excerpts of the Temple Deposition are attached as Exhibit 1 to the Declaration of Karen F Jones in Support of Allstate's Motion for Summary Judgment ("Jones Decl ")

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 2
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   Office Agent" ("NOA") in a single-agent office in Port Angeles, Washington under a

2   contract with Allstate referred to as the R1500 contract   (Hutton Decl ¶ 7, Temple

3   Dep  at 40.13 – 41.8, 45 14-18 )  The facts relevant to this case occurred during the

4   period beginning in the August of 1998 through June 30, 2000  See Second

5   Amended Complaint at ¶¶ 14 – 27   Because Temple asserts numerous claims,

6   each of which turns on different facts, Allstate will discuss the relevant facts in the

7   context of the legal claims to which they relate

8                   ### III. SUMMARY JUDGMENT STANDARD

9         Summary judgment is appropriate under Fed  R  Civ  P  56 where there is no

10   genuine issue as to any material fact and the moving party is entitled to judgment as

11   a matter of law   British Airways Board v  Boeing Co , 585 F 2d 946, 950-51 (9th Cir

12   1978)  In discrimination cases, as in other disputes, summary judgment is an

13   appropriate vehicle for courts to identify meritless suits and dispense with them

14   short of trial   Foster v  Arcata Assocs, Inc , 772 F 2d 1453, 1459 (9th Cir  1985)

15   (affirming summary judgment on employee's claims of age and sex discrimination),

16   overruled on other grounds by Kennedy v  Allied Mutual Ins  Co , 952 F 2d 262,

17   266-67 (9th Cir  1991), Schwenke v  Skaggs Alpha Beta, Inc , 858 F 2d 627, 628

18   (10th Cir  1988)  Summary judgment is intended to avoid a useless trial before a

19   finder of fact   Adler v  Federal Republic of Nigeria, 107 F 3d 720, 728 (9th Cir

20   1997)

21   ### IV. TEMPLE'S CLAIMS RELATING TO ALLSTATE'S "PREPARING FOR THE FUTURE" PROGRAM SHOULD BE DISMISSED.

22

23         Several of Temple's claims relate to a program that Allstate announced in

   November 1999 called the  "Preparing for the Future Program" (the "Program")

24   Under this Program, for the reasons discussed below, Allstate made the business

25   decision to eliminate  all of the agency programs except its independent contractor

26

Defendant Allstate's Motion for Summary Judgment,                    Ruddell Williams P s
Case No  C01-5124 - Page 3                                 1001 FOURTH AVENUE PLAZA
291/320177 02                                                          SUITE 4500
082002/1237/42496 00103                                   SEATTLE  WA  98154-1065
                                                                  (206) 624-3600

1   Exclusive Agency program   (Hutton Decl ¶ 15 )  As part of the Program, Allstate

2   announced in November 1999 that it would terminate all of its employee agent

3   contracts effective June 30, 2000 [2]  (Id at ¶ 16 )  The decision to terminate the

4   employee agency program affected all employee agents regardless of the agents'

5   age, performance or any other criteria, including whether or not the agent had

6   asserted any claims against Allstate   (Id at ¶¶ 15-17 )  Although not obligated to do

7   so, Allstate offered each affected agent a choice of four post-termination options,

8   three of which provided enhanced severance benefits conditioned upon the agent's

9   signing a standard waiver and release of claims (the "Release")   (Id at ¶ 16 )

10  Agents who did not sign the Release received basic severance pay of up to thirteen

11  weeks   (Id at ¶ 18 )  Allstate gave the agents until June 1, 2000—more than six

12  months—to evaluate and decide among these options   (Id at ¶ 16 )  Temple did

13  not sign the Release and, therefore, he received basic severance benefits and

14  retained the right to sue Allstate   (Id )

15        Prior to Allstate's announcement of the Program, Temple had requested that

16  Allstate accommodate an alleged disability, and he had complained that he should

17  be paid overtime   (See Second Amended Complaint at ¶¶ 16-17, 35 )  In this

18  lawsuit, Temple appears to contend that Allstate's decision to eliminate its

19  employee agency program, and its  requirement that agents sign the Release in

20  order to receive the enhanced post-termination benefits, was a form of retaliation

21  against him for having requested accommodations and complained about overtime

22  He also claims that the Release was targeted at older employees and constituted

23  disparate treatment, and that the Release had a disparate impact on employees

24  who had colorable claims against Allstate   None of these claims has any factual or

---

[2] The Program was not implemented in West Virginia due to specific requirements in that
state   The Program's effective date varied in Delaware and Montana due to specific
requirements in those states

Ruddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE  WA  98154-1065
(206) 624-3600

1  legal support

2  **A.    Undisputed Facts Related to These Claims.**

3  **Agent Programs Prior to 1999**

4  Prior to 1984, Allstate sold its insurance products exclusively through
5  employee agents located in Sears retail stores or in local sales offices known as
6  "Neighborhood Sales Offices" or "NSOs " (Hutton Decl ¶ 5 ) NSO agents worked
7  in groups, and their office space, support staff, and standard office equipment and
8  furniture were provided by Allstate  (Id ) In response to changing market
9  conditions, Allstate revised its agent structure in 1984 and introduced the
10  "Neighborhood Office Agent" or "NOA" program   (Id ) This program was designed
11  to provide employee agents with more entrepreneurial freedom, and it initially
12  proved extremely successful for Allstate and its agents   (Id )

13  Prior to June, 2000, Allstate's employee agents worked under a number of
14  different written employment contracts, including the "R830" and "R1500" contracts
15  (Hutton Decl ¶ 9 ) Under both the R830 and R1500 contracts, Allstate employee
16  agents were at-will employees who could be terminated with or without cause at any
17  time  Id  Temple was employed under the R1500 contract, which stated that "<u>Your</u>
18  <u>employment and this Agreement may be terminated at-will by either party</u>, subject
19  only to such limitations and restrictions as may be imposed by law, and in
20  accordance with Company rules and procedures " (<u>Id</u> at ¶ 9, Ex  A ) Neither the
21  R830 nor the R1500 contract contained any term that provided for severance
22  benefits if either party terminated the agreement or the agent's employment  (<u>Id</u> )
23  Agents such as Temple who were employed under R1500 or R830 agreements did
24  not obtain a transferable interest in any of the insurance business they produced or
25  serviced (also referred to as "book of business")  (<u>Id</u> at ¶ 10 ) Consequently,
26  Temple did not own the customer accounts of the Allstate policyholders that he sold

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 5
291/320177 02
082002/1237/42496 00103

Riddell Williams p s
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1    or serviced on behalf of Allstate and he could not sell those accounts to anyone

2    In 1990, Allstate further revised its agency structure by introducing the

3    Exclusive Agency ("EA") program.  (Hutton Decl ¶ 11 )  Under the EA program,

4    new agents typically started as employee agents under the "R3000" agreement

5    (Id )  After 18 months, if the agent met specific production standards and other

6    requirements, subject to company approval, the agent was offered the "R3001" EA

7    contract to sell Allstate products as an independent contractor  (Id )  All agents who

8    were engaged after 1990 were offered contracts only under this new Exclusive

9    Agency program   (Id )

10   **The 1999 Business Reorganization Decision**

11   In November 1999, Allstate announced its decision to move forward with a

12   new business model, designed to increase productivity for the company and its

13   agents, and to allow the company to better compete in a changing marketplace

14   (Hutton Decl ¶ 12 )  In connection with its new business model, Allstate adopted

15   the "Preparing for the Future Program" to enhance growth and profitability by,

16   among other changes, consolidating multiple agent programs, contracts and

17   compensation schedules into a single Exclusive Agency independent contractor

18   program   (Id )

19   The Preparing For the Future Program involved the streamlining and

20   reorganization of Allstate's agency force, from six different agency programs (under

21   various contracts including the R830, R1500, R3000 and R3001 contracts) with

22   over eleven different sets of contract administrative requirements into a single

23   program   (Hutton Decl ¶ 13 )

24   When Allstate announced its new business model and the Preparing for the

25   Future Program in 1999, the company had approximately 6,000 independent

26   contractor agents in its EA program and approximately 6,400 employee agents

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 6
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1 | working under either the R830 or R1500 contracts   (Hutton Decl ¶ 14 )

2 |     Allstate made a business decision to eliminate all of the agency programs
3 | except its Exclusive Agency independent contractor program   (Hutton Decl ¶ 15 )
4 | This decision to terminate employee agent contracts was reached in November
5 | 1999, prior to announcing the Preparing For the Future Program   (Id ) Allstate's
6 | decision was based on a number of considerations, including the increased
7 | productivity of independent contractor agents and Allstate's business judgment and
8 | belief that the Exclusive Agency independent contractor program was and would
9 | continue to be its most successful agency program   (Id ) In addition, Allstate
10 | wanted to streamline the administration of its agency programs   (Id ) The cost and
11 | complexity associated with making changes to all of its existing programs were
12 | inefficient, and Allstate wanted to better position itself and its agents to more quickly
13 | and competitively respond to the demands of the market   (Id )

14 |     Allstate announced the Preparing for the Future Program to all of its agents
15 | in November 1999   (Hutton Decl ¶ 16 ) At that time, the company announced that
16 | the employment of <u>all</u> of its employee agents would be terminated as of June 30,
17 | 2000   (Id ) Allstate also announced that each terminated agent would have the
18 | choice of four options after employment termination   (Id ) Three of those options,
19 | described in more detail below, involved the execution of a release for which the
20 | terminated employee agent would receive valuable consideration   (Id ) Each of the
21 | affected agents was provided with a package of written materials regarding the
22 | Program, which included an explanation of why Allstate was terminating the
23 | contracts with its employee agents, and detailed information about the four options
24 | and how the Program could benefit employee agents   (Id at Ex B ) Along with the
25 | program booklet, Allstate gave each employee agent a Release Notice that
26 | specifically explained the release associated with three of the four options described

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 7
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   below  (Id  at ¶ 16 )  Among other things, the Release Notice specifically
2   encouraged agents to consult with their attorney prior to signing the release  (Id
3   Ex  C )  Agents were given until June 1, 2000—more than six months—to evaluate
4   their options, consult with their attorneys if they so chose,  and decide whether or
5   not to sign the release  (Id  at ¶ 16 )

6       Allstate's decision to terminate the employment of employee agents as part
7   of the Preparing for the Future Program extended to all of Allstate's employee
8   agents in the United States (with the exception of agents in West Virginia due to
9   specific requirements in that state), regardless of whether the agent signed a
10  release  (Hutton Decl  ¶ 17 )  Allstate terminated the employment of all employee
11  agents, and offered all the same choice of four post-employment options,
12  regardless of age, productivity, performance, or any other criteria, including whether
13  or not the agent had asserted any claims against Allstate  (Id )

14      Under the first option, Severance Option Without Release, each terminated
15  employee agent could choose to receive basic severance pay of up to thirteen
16  weeks  (Hutton Decl  ¶ 18 )  Under this option, the terminated employee agent was
17  not required to sign a release, but instead retained his or her right to assert any
18  claims against Allstate should he or she have them and desire to do so  Temple did
19  not sign the release and, therefore, received these benefits  (Id )

20      The remaining three options gave agents an opportunity to receive
21  substantial benefits and consideration not otherwise available to the agent and to
22  which they were not otherwise entitled  (Hutton Decl  ¶ 19 )  As is customary,
23  agents who wanted to take advantage of one of these options, were required to sign
24  a release in exchange for receiving these enhanced benefits  (Id )  These options
25  provided as follows

26      (a) **The Independent Contractor Option**  the terminated employee agent

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 8
291/320177 02
082002/1237/42496 00103

1   could choose to become an Exclusive Agent and sell Allstate insurance as an

2   independent contractor  (Id ) In exchange for signing a release, terminated

3   employee agents who elected to become Exclusive Agents would receive the

4   following benefits and consideration

5           (1) An opportunity to earn a transferable economic interest in their

6       book of business, including the portion previously written as an employee

7       agent, after only two years (as contrasted with five years under the earlier EA

8       independent contractor program),

9           (2) A conversion bonus of at least $5000,

10          (3) Forgiveness of any debts of an office expense allowance advance

11      that otherwise would have to be re-paid upon termination, and

12          (4) The opportunity to grow their business and expand in new ways,

13      including purchasing other books of business, setting up local agency

14      extensions, and if qualified, expanding to satellite agency locations

15      (b) **The Sale Option**  in exchange for a release, the terminated employee

16  agent could choose to become an independent contractor  Then, after only one

17  month (instead of the two years required under the newly enhanced EA program),

18  the agent could acquire and sell a transferable interest in his or her entire book of

19  business, including business generated as an employee agent prior to August 1,

20  2002 (in contrast, agents who had converted to the EA program previously acquired

21  only an interest in business generated after their conversion), or

22      (c) **The Severance Option With Release**  in exchange for a release, the

23  terminated employee agent could choose to receive enhanced severance benefits

24  equal to one year's pay based upon the greater of the 1997 or 1998 year-end

25  authorized compensation  (Hutton Decl ¶ 19 )

26

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 9
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE  WA  98154-1065
(206) 624-3600

1    Contrary to Temple's assertion, Allstate did not consider any agent claims in

2    making its business decisions to eliminate the employee agent program or in

3    designing or implementing any aspect of the Preparing for the Future Program,

4    including the terms and conditions of the four options it offered affected agents

5    (Hutton Decl ¶ 20 ) In making such decisions, Allstate did not assemble, analyze,

6    or review any data about agent litigation or claims or the costs associated with such

7    litigation or claims    (Id ) The decisions to terminate the employment of its

8    employee agents and to offer the four options described above were made in

9    Allstate's home office in Northbrook, Illinois and did not involve any of Temple's

10   management in the Seattle region or anyone with knowledge of Mr Temple's

11   claims, to the extent he had any    (Id )

12   **B.    Temple's Retaliation Claim Fails Because There is No Evidence of a
           Causal Relationship Between Temple's Alleged Protected Activity and**
13        **Any Adverse Employment Action.**

14        To establish a prima facie case of retaliation under the ADA, the ADEA, the

15   Washington Law Against Discrimination ("WLAD"), the Fair Labor Standards Act

16   ("FLSA") and the Washington Minimum Wage Act ("MWA"), the plaintiff must show

17   that (1) he was engaged in a protected activity, (2) his employer subjected him to

18   adverse employment action, and (3) there is a causal link between the protected

19   activity and the employer's action   See, e g , Villiarmo v  Aloha Island Air, Inc , 281

20   F 3d 1054, 1064 (9th Cir 2002), Weeks v  Harden Mfg  Corp , 291 F 3d 1307, 1311

21   (11th Cir 2002), Wolf v  Coca-Cola Co , 200 F 3d 1337, 1342-43 (11th Cir 2000),

22   Francom v  Costco Wholesale Corp , 98 Wn App  845, 862, 991 P 2d 1182, review

23   denied, 141 Wn 2d 1017, 10 P 3d 1071 (2000)   A plaintiff who fails to present

24   evidence indicating any causal nexus between his protected activity and the

25   employer's adverse employment action cannot survive summary judgment   See

26   McAlindin v  County of San Diego, 192 F 3d 1226, 1239 (9th Cir 1999), Feldman v

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 10
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1  American Mem'l Life Ins Co, 196 F 3d 783, 793 (7th Cir 1999)  There is no causal

2  nexus if the plaintiff was treated the same as all other employees because, in that

3  case, the plaintiff cannot establish that he was targeted for unfavorable treatment

4  due to his protected activity  McAlindin, 192 F.3d at 1239

5       Temple claims that (1) he and some unidentified population of employee

6  agents engaged in protected activity, (2) he suffered from adverse employment

7  actions, specifically, Allstate's decision to terminate his employment and require him

8  to sign the Release to receive post-termination benefits, and (3) the adverse

9  employment actions were caused by either his protected activity or Allstate's desire

10  to terminate every employee agent who had engaged in protected activity  Even

11  assuming solely for purposes of this Motion that Temple can satisfy the first two

12  elements of the test, he cannot satisfy the third element, because he cannot

13  establish any link between Allstate's decisions and any protected activity

14       Temple has no evidence that Allstate's decisions concerning the Preparing

15  for the Future Program related in any way to his claims or those of other agents  To

16  the contrary, the uncontroverted evidence shows that there was no such

17  connection

18       ▪  Allstate terminated Temple's employment as part of a company-wide
          reorganization that affected every one of Allstate's thousands of
19          employee agents, whether or not they had engaged in protected activity
          (Hutton Decl ¶¶ 12-17, 20 )
20
          ▪  Allstate made its decision to implement Preparing for the Future for
21          legitimate business reasons unrelated to any protected activities   (Hutton
          Decl. ¶¶ 15, 20 )
22
          ▪  Allstate offered the same choice of four post-employment options to every
23          affected employee agent, regardless of age, productivity, performance, or
          any other criteria, including whether or not the agent had asserted any
24          claims against Allstate   (Hutton Decl ¶¶ 16-17, 20 )

25       ▪  Three of the options provided substantial enhanced benefits to which the
          agents were not otherwise entitled   Every terminating employee agent
26          who wished to receive these enhanced benefits was required, in

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 11
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1  exchange, to sign the Release to receive certain post-termination benefits
2  and business opportunities, regardless of whether they had engaged in
   any protected activity or previously asserted claims against Allstate
   (Hutton Decl ¶¶ 18-19 )

3
4  ▪ In making the decisions in question, Allstate did not consider the age,
   gender, race, disability, or other protected status of the agents, nor did it
   consider any agent claims   Allstate did not assemble, analyze, or review
5  any data about agent litigation or claims or the costs associated with such
   litigation or claims   (Hutton Decl ¶¶ 15, 20 )
6
7  ▪ The decisions in question were made in Allstate's home office and did not
   involve any of Temple's management in the Seattle region or anyone with
   knowledge of Temple's claims   (Hutton Decl ¶ 20 )
8
9      In short, Temple cannot demonstrate that either he, or the unnamed group of

10 agents who allegedly engaged in unspecified protected activities, were treated any

11 differently than any other employee agent   There is simply no evidence to show

12 that Allstate targeted Temple or other agents who had asserted claims in making

13 the decisions in question—in fact, the evidence establishes unequivocally that it did

14 not   As a result, Temple cannot establish a causal connection between his alleged

15 protected activity and the alleged adverse union   This Court should therefore

16 dismiss Temple's retaliation claim   See, e g , Villiarmo v  Aloha Island Air, Inc , 281

17 F 3d 1054, 1064-65 (9th Cir 2002) (affirming summary judgment in favor of

18 employer where employee failed to show causal link between protected activity and

19 adverse action), Bailey v  Southwest Gas Co , 275 F 3d 1181, 1187 (9th Cir 2001)

20 (same), Nichols v  Azteca Rest  Enters , 256 F 3d 864, 878 (9th Cir 2001) (same)

21 **C.  It is Not Retaliatory to Require Terminated Employees to Sign a Release
   in Consideration for Receiving Substantial Benefits to Which They Are
   Not Otherwise Entitled**

22     Temple's theory that it was retaliatory for Allstate to require a waiver of

23 claims in exchange for enhanced post-termination benefits is completely out of step

24 with the facts and the law   Numerous courts have acknowledged and upheld the

25 common practice of requiring a waiver as a condition of a terminated employee's

26 receipt of post-termination benefits

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 12
291/320177 02
082002/1237/42496 00103

1
2
3

> When a worker within the class protected by age discrimination law
> (age 40 and up) leaves his employment, it is common for the employer
> to try to obtain a waiver of the workers' rights to bring a suit under that
> law   Such waivers are enforceable if they comply with [applicable
> law]

4
5
6
7
8
9
10
11
12

Blackwell v  Cole Taylor Bank, 152 F 3d 666, 669 (7th Cir  1998)   The Seventh

Circuit's view is consistent with numerous holdings by other federal courts that the

use of such waivers advances the public's interest in resolution of actual or potential

disputes.  See, e g , Melanson v  Browning-Ferris, Indus , Inc , 281 F 3d 272, 274

(1st Cir  2002) (the release of federal statutorily created rights ordinarily will be

given legal effect so long as the release is knowing and voluntary), Stroman v  West

Coast Grocery Co , 884 F 2d 458, 460-61 (9th Cir  1989) (a general release of Title

VII claims does not violate public policy and, to the contrary, public policy supports

the settlement of employment discrimination claims)

13
14
15
16
17
18
19
20

Allstate had the right to terminate the employment of Temple and its other

employee agents with no notice and without providing any post-termination benefits

Instead, it gave the agents more than six months' notice in advance of their

termination, and it offered them significant post-termination benefits to which they

were not entitled under their contracts or otherwise   Allstate's request for a release

in consideration for those valuable benefits was consistent with standard business

practice and public policy and does not give rise to an inference of retaliatory

motive

21
22

**D.    Even If Temple Has Stated A Prima Facie Retaliation Claim, His Claim
       Must Be Dismissed Because Allstate Has Provided a Legitimate Non-
       Discriminatory Reason For Its Decisions**

23
24
25
26

If a plaintiff establishes a prima facie retaliation claim, the burden shifts to the

employer to provide a legitimate, nondiscriminatory reason for its actions

McAlindin, 192 F 3d at 1238   If the employer produces such a reason, the plaintiff

must respond with "specific, substantial evidence of pretext "  Id

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 13
291/320177 02
082002/1237/42496 00103

Riddell Williams p s
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1       For the reasons described above, Temple has failed to establish a prima

2   facie retaliation claim   However, even if he were to satisfy this burden, Allstate has

3   produced legitimate nondiscriminatory reasons for the Program   it wanted to

4   streamline its operations and avoid the cost and complexity of operating multiple

5   agency programs and administering different contracts by moving to a single

6   agency contract, which it believed would better position the company and its agents

7   to compete more effectively, and it believed that its Exclusive Agency independent

8   contractor program was and would continue to be its most successful agency

9   program   (Hutton Decl ¶ 15 )  Allstate did not consider <u>any</u> agent claims in making

10   its business decision to eliminate the employee agent program or in designing or

11   implementing any part of the Program, including its use of the Release, and there is

12   no evidence to suggest the decision makers in Allstate's Home Office had any

13   knowledge of Temple's claims   (Hutton Decl. at ¶ 20 )  Temple cannot produce <u>any</u>

14   evidence that Allstate's legitimate non-discriminatory motivation for the Program is

15   pretextual  Accordingly, his retaliation claim must be dismissed   <u>See</u>, <u>e g</u>, <u>Strahan</u>

16   <u>v  Kirkland</u>, 287 F 3d 821, 826 (9th Cir  2002) (affirming summary judgment for

17   employer on retaliation claim where plaintiff did not create genuine issue of material

18   fact that employer's legitimate non-retaliatory reason for employment action was

19   pretext), <u>Yap v  Slater</u>, 165 F  Supp  2d 1118, 1128-29 (D  Hawaii 2001) <u>Harris v </u>

20   <u>Oregon Health Sci  Univ </u>, 1999 WL 778584, *8 (D  Or  1999)

21   **E.**   **<u>Temple has No Evidence to Support his Claim that the Release</u>**
         **<u>Targeted Older Employees and Constituted Disparate Treatment.</u>**

22

23       Temple also claims that Allstate's decision to terminate all of its employee

   agents violated the ADEA and the WLAD because it was specifically targeted at

24

   older employees  Again, there is no evidence to support this assertion

25

       To survive summary judgment on his disparate treatment claim, Temple must

26

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 14
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   produce credible evidence showing that Allstate intentionally treated some

2   employees less favorably than others because of their age   Foss v Thompson, 242

3   F 3d 1131, 1134 (9th Cir 2001), Rose v Wells Fargo & Co., 902 F.2d 1417, 1421

4   (9th Cir 1990), Kuyper v State, 79 Wn App 732, 739, 904 P 2d 793 (1995)[3]

5   Here, the uncontroverted evidence shows that Allstate did not take age into account

6   in making its decisions, and that it treated all employee agents the same, regardless

7   of their age   (Hutton Decl ¶¶ 15-17 )  Temple has no evidence to show that

8   Allstate's stated reason for its decisions is a pretext for unlawful age discrimination

9   See, e g , Kuyper, 79 Wn App at 736-39 (granting summary judgment for employer

10  where plaintiff did not produce evidence of pretext for age discrimination), Kohn v

11  Georgia-Pacific Corp , 69 Wn App 709, 726, 850 P 2d 517 (1993) (same), see also

12  discussion in Section D above   For this reason, Temple's disparate treatment age

13  discrimination claim must be dismissed

14  **F.    Temple Fails to State a Claim for Disparate Impact Because He Does**
      **Not Allege that Allstate's Decisions Disparately Impacted any**
15    **Cognizable Protected Group.**

16      In addition to his retaliation and disparate treatment claims, Temple also

17  claims that Allstate's use of the Release had a disparate impact on employee

18  agents who had "colorable claims" against the company   Second Amended

19  Complaint at ¶ 30  This allegation, even if true (which it is not), fails to state a claim

20  for disparate impact because agents "with colorable claims" are not a group

21  protected by any statute   Temple does not allege, and cannot prove, that Allstate's

22  decisions had a disparate impact on older agents, disabled agents, or agents in any

23  other group protected by relevant statutes

24      In claiming that Allstate's decisions had a "disparate impact," Temple

---

25  [3] The Washington Law Against Discrimination mirrors the language of Title VII, and
26  Washington courts look to ADEA case law for guidance   Grimwood v University of Puget
    Sound, Inc , 110 Wn 2d 355, 361, 753 P 2d 517 (1988)

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 15
291/320177 02
082002/1237/42496 00103

Ruddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1    appears to confuse the concept of retaliation with disparate impact  As discussed

2    above, retaliation requires a showing that an employer took some adverse action

3    based upon an employee's protected <u>activity</u>, such as filing a claim  Temple's

4    allegation that Allstate decided to end its employee agency program because it

5    wanted to rid the company of agents who had asserted discrimination claims is a

6    claim for retaliation, and should be dismissed for the reasons cited previously

7         In contrast, disparate impact requires a showing that a facially neutral

8    employment practice has a significantly discriminatory impact "upon a group

9    protected by the statute " <u>Paige v  California</u>, 2002 WL 1579101 at *2 (9th Cir

10   2002)  Each discrimination statute describes the group(s) it protects  Under Title

11   VII, "[a]n unlawful employment practice based on disparate impact is established

12   under this title only if a complaining party demonstrates that an employment

13   practice that causes a disparate impact <u>on the basis of</u> race, color, religion, sex or

14   national origin "  42 U S C  § 2003-2(k) (emphasis added)  The ADEA protects

15   "individuals who are at least 40 years of age "  29 U S C  § 631(a)  The ADA

16   protects "qualified individuals with a disability "  42 U S C  § 12132  These are the

17   only "protected groups" described by the statutes  The only "protected groups" that

18   arguably include Temple are individuals with disabilities and individuals 40 and

19   older

20        A viable disparate impact claim exists only if an employer discriminates

21   against one of these protected groups  Thus

22        To state a prima facie case under a disparate impact theory, a plaintiff
         must demonstrate (1) the occurrence of certain outwardly neutral
23       employment practices, and (2) a significantly adverse or
         disproportionate impact on [in the case of the ADA] persons of a
24       particular age produced by the employer's facially neutral practices

25   <u>Katz v  Regents of the Univ  of Calif</u>, 229 F 3d 831, 835 (9th Cir 2000)  People

26   "who have colorable claims" are not a protected group

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1    Temple does not allege, nor can he prove, that Allstate's use of a Release

2  disparately impacted agents with disabilities or those 40 and over   Even assuming

3  that some older agents had "colorable claims" against Allstate or that there were

4  agents with disabilities and that some of them had "colorable claims," that does not

5  prove, or even suggest, that Allstate's decisions had a disparate impact on the class

6  of older or disabled agents   To the contrary, as discussed above, Allstate's

7  Program was designed and implemented in a manner that affected all agents

8  equally   Accordingly, Temple's disparate impact claim fails as a matter of law

9  **G.    Temple's Disparate Impact Claim Must Be Dismissed Because He Has**
   **Failed To Present Any Evidence To Support His Claim.**

10    Even assuming that Temple's disparate impact theory is conceptually sound

11  and identifies a cognizable protected group, it fails for lack of evidence

12    To present a prima facie case of disparate impact discrimination, Temple

13  must demonstrate   (1) a specific employment practice that (2) causes a significant

14  discriminatory impact   Paige, 2002 WL 1579101 at *2   A disparate impact analysis

15  requires before and after snapshots, so to speak, to determine the effect of the

16  employment practice in question

17
      In evaluating the impact of a particular process, we must compare the
18    group that "enters" the process with the group that emerges from it  .
      The best evidence of discriminatory impact is proof that an
19    employment practice selects members of a protected class in a
      proportion smaller than in the actual pool of eligible employees
20
   Id  at *3 (emphasis added)   The Ninth Circuit's comments emphasize that statistical

21  analysis is used to determine whether a selection process selects candidates from a

22  protected group at a different rate than from all other groups of individuals   Id , see

23  also Griggs v  Duke Power Co , 401 U S  424, 432 (1971), Stout v  Potter, 276 F 3d

24  1118, 1123 (9th Cir  2002)   Statistical evidence is used to demonstrate how a

25  particular employment practice results in a protected minority becoming

26

Ruddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1  underrepresented   Paige, 2002 WL 1579101 at *2   The evidence must show a

2  disparity that is "sufficiently substantial" as to "raise such an inference of causation "

3  Id  (quoting Watson v  Fort Worth Bank & Trust, 487 U S  977, 995 (1988))

4  Temple's disparate impact theory utterly fails when subjected to this

5  standard   Allstate has presented unrebutted evidence that the pool of Allstate

6  agents considered for termination is identical to the pool of agents whose

7  employment was terminated, and this is the same pool that was required to sign the

8  Release as consideration for valuable post-termination benefits and business

9  opportunities   These requirements were identical for employee agents in protected

10  classes and those who had not   As a result, there was no disparity whatsoever

11  (and certainly not a "substantial disparity") in the treatment of "employees with

12  colorable claims "  Accordingly, Temple's disparate impact claim should be

13  dismissed

14  **H.    Temple's Claim That The Release Violated the ADEA Should Be**
      **Dismissed Because the EEOC Is Pursuing that Claim in a Separate**
15      **Action.**

16  In addition to the foregoing, Temple's retaliation claim under the ADEA fails

17  on procedural grounds   On July 29, 2000, Temple filed a charge with the Equal

18  Employment Opportunity Commission ("EEOC") in which he alleged that Allstate's

19  use of the Release violated the anti-retaliation provisions of Title VII, the Americans

20  with Disabilities Act ("ADA"), and Age Discrimination in Employment Act ("ADEA")

21  See Second Amended Complaint at ¶¶ 24-25   The EEOC issued a determination

22  notice in his favor in September 2000   Id   On December 28,  2001, the EEOC filed

23  a separate action in United States District Court for the Eastern District of

24  Pennsylvania, in which it is pursuing claims under the ADA and ADEA identical to

25  those alleged in Temple's Second Amended Complaint    See Complaint in EEOC

26

1   v  Allstate Insurance Co , Civil Action No  01-CV-7042 [4]

2        Under the ADEA, the filing of a complaint by the EEOC on an individual's

3   behalf terminates the right of the individual to bring his or her own suit   Under

4   section 7(c)(1), "the right of any person to bring such action shall terminate upon the

5   commencement of an action by the [EEOC] to enforce the right of such employee

6   under this chapter "  29 U S C  § 626(c)(1), see also EEOC v  Pan Am  World

7   Airways, Inc , 897 F 2d 1499, 1505 (9th Cir  1990), Binker v  Comm  Of

8   Pennsylvania, 977 F 2d 738, 745-46 (3d Cir  1992)    Pursuant to the foregoing

9   authorities, Temple cannot pursue his ADEA claims in this lawsuit, and those claims

10   must be dismissed for this additional reason

11   ### V. TEMPLE IS NOT ENTITLED TO OVERTIME PAY BECAUSE HE WAS AN EXEMPT ADMINISTRATIVE EMPLOYEE UNDER FEDERAL AND STATE LAW.

12        Temple also claims that he is entitled to overtime pay under the FLSA, 29

13   U S C  § 201 et seq , and the MWA, RCW 49 46, for all hours he worked over 40 in

14   each workweek of his employment with Allstate   Two federal courts have recently

15   rejected identical claims on summary judgment, holding that Allstate agents like

16   Temple are exempt from overtime requirements   See Wilshin v  Allstate Ins  Co , --

17   F  Supp 2d --, 2002  WL 1474092 (M D  Ga , May 10, 2002) (single NOA exempt),

18   Hogan, et al  v  Allstate Ins  Co , -- F  Supp 2d --, 2002 WL 1396846 (M D  Fla ,

19   June 25, 2002) (NOAs in a collective action were exempt) [5]   The reasoning of those

20   courts is sound and persuasive, and should be adopted in this case

21   ### A.    Undisputed Facts Related to this Claim.

22        The NOA program allowed agents to run an Allstate agency and was

23   designed to provide employee agents with more entrepreneurial freedom   (See

24   Hutton Decl  ¶ 6 )  The primary duties of an NOA  were the promotion and sale of

25

26   [4] A copy of the Complaint is attached as Exhibit 2 to the Jones Decl
     [5] Copies of these cases are attached as Exhibit 3 to the Jones Decl

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 19
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   Allstate's insurance products, advising customers regarding Allstate's products and

2   closing sales for these products, providing service and representing Allstate to their

3   customers, and managing the operation of their office, including the management of

4   both licensed and unlicensed support staff utilized by the agent   (Id at ¶ 7 )

5         As an NOA, Temple had wide discretion in managing his agency business on

6   a day-to-day basis   Along with three other agents, Temple was the primary contact

7   for Allstate customers in the Port Angeles area   (Temple Dep  at 91 2-9 )  When he

8   set up his own agency, Temple selected the location and negotiated the lease.[6]  (Id

9   at 40 22 – 42 7, 44 21 – 45 1, 87 25 – 91 1 )  He decided whether to hire staff,

10  whom he should hire, and how long staff would work   (Id  at 115 24 – 116 6, 402 4

11  – 404 1 )  He determined how to use his office expense allowance   (See id  at

12  99 10-23, 141 5 – 143 6 )  Like other NOAs, Temple and his manager also agreed

13  on general annual sales goals and designed a business plan or set other

14  benchmarks (whether formal or informal) to meet those goals   (See Hutton Decl  ¶

15  8 )

16        Although he and his manager discussed sales goals and plans to meet them,

17  it was Temple who decided how to go about building his agency business   Temple

18  explained in his deposition that he determined how to build the business·

19        Q    And I assume that your managers also helped you build your
             book of business   Would that be fair to say?
20
21        A    In my sales career I had more experience than my
             managers

22        Q    Okay

23

24  ─────────────────
    [6] A person Temple planned to partner with found the location and negotiated the lease on
25  behalf of both of them   (Temple Dep  at 41 5  - 42 7 )  Although Allstate management
    reviewed and authorized the lease, no one at Allstate ever failed to approve a lease
26  negotiated by Temple   (Id  at 89 19 – 90 1 )  Temple signed the lease, and his Allstate
    manager did not have any dealings with his landlord   (Id  at 90 13 – 91 1 )

Riddell Williams p s
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE  WA  98154-1065
(206) 624-3600

1    A    I built my book of business. They showed me the company
2    guidelines to stay within I used my own sales techniques
and my discovery processes that I had learned throughout
3    my sales career incorporating their, Allstate's, and my
General Motors training and all these to bring everybody in
    So I built, I did the selling I went to them I mean it
4    wasn't a matter of Penny or Randy [Allstate managers]
coming up and saying here, Steve, here's what I want you to
5    do They did do that, but I had tried and proven measures
and that were very successful, and I incorporated their
6    thoughts in, but these were still mine because I firmly
believed in them and they brought in business

7    (Temple Dep at 114 6 – 115 2 )

8    In addition, Temple developed and used his own sales methods Temple

9    testified in his deposition that there is no "magic formula" or "cookie cutter" way of

10    making sales and described the sales methods he chose to use·

11
    Meeting and greeting and shaking hands and calling people I'd sold
12    cars to, my friends, my relatives Anybody that I had within my circle
or outside of my circle I walked around with a briefcase in my hand
13    full of applications for over 3 years Everybody I shook hands with or
looked at was a potential customer

14

15
    One brick at a time, one customer at a time, you get to know them,
16    you get them to trust you, you get them to understand that you're
there for them to take care of their needs, not just when you're selling,
17    but when they actually need you, when they have losses and
everything else Once they have established that you have
18    established that type of rapport, they tell their circle of people, come
and see my agent, he's great, come and see the person that takes
19    care of us

20    (Temple Dep at 114 20 – 115 3  115 8-17 )

21    In addition to his agency management and sales duties, Temple was

22    responsible for retaining customers and managing day-to-day contacts with

23    customers for both sales and service  (Temple Dep at 490 17 – 491 21 ) He

24    exercised substantial discretion in meeting these responsibilities  For example,

25    Temple, and not Allstate, selected the means by which he attempted to market and

26    increase his visibility  Allstate did not require agents to advertise at all, and did not

Defendant Allstate's Motion for Summary Judgment,
Case No C01-5124 - Page 21
291/320177 02
082002/1237/42496 00103

1    require agents to spend any specific amount on advertising  (Id  at 96.15-22,

2    99 10-23 )  However, Temple chose to advertise in the local Yellow Pages and

3    shared an advertisement with three other agents in the area   (Id  at  92 1 - 93 14 )

4    He designed that advertisement, which was approved by Allstate   (Id  at 93 9-14 )

5    Temple also decided to advertise in the *Daily News* and at one point advertised on

6    the radio   (Id  at 102 13-16, 110 20 – 111 13 )  Finally, Temple decided how much

7    to spend on advertising out of the Office Expense Allowance provided by Allstate

8    (Id  at 99 24 – 100 3 )

9          Temple also decided how to retain his customers and followed through with

10   his plan

11         Q     What did you have to do, Mr  Temple, in order to retain your
                 business?
12
         A     Constant contact, servicing, reviewing files, the customers'
13            policies, updating, suggestions of better coverage, give
              them the options   I always like to think my clients were well
14            informed   I didn't make the choice for them   I gave them
              the information and let them make the choice, based on
15            being properly informed   I think one of the biggest things is
              caring for the client  When it comes across that you're a
16            trustworthy individual, that once they give you their trust,
              saying that they trust you   And so I think the better your
17            retention is based on that value there

18   (Temple Dep  at 491 5-17 )

19         Similarly, Temple helped customers with any problems   (Temple Dep  at

20   117 21-23 )  According to Temple, he handled customer problems on his own and

21   did not turn to his managers for help  (See id  at 118 1-10, 118 23 – 119 21 )

22   Although his managers "liked to give suggestions and feel important," Temple never

23   turned to them for help and advice on customer problems   (Id  at 118 23 – 119 9 )

24         Additional examples of specific tasks Temple performed include   prospecting

25   or soliciting for insurance, quoting premiums, discussing or providing advice

26   concerning coverage, limits, or deductibles, interviewing customers for the purpose

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 22
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1  of completing an application, binding new policies or making changes to existing

2  policies, and accepting payments   (Temple Dep  at 497 5 – 498 10 and Exhibit 35 )

3        As an NOA, Temple was paid a commission on his sales, but he received a

4  guaranteed minimum monthly amount of compensation    During 1998 and 1999,

5  the minimum monthly compensation was $1,500  (Declaration of Rollie Poulter

6  ("Poulter Decl ") ¶ 6 , attached as Exhibit 12 to Jones Decl ) Temple far exceeded

7  that amount, earning $55,623 50 in 1998 and $56,644 98 in 1999, but the minimum

8  was guaranteed for each month   (See W-2 Forms for Temple from Allstate, copies

9  attached as Exhibit 4 to the Jones Decl )

10       Although Temple ran his agency and was responsible for virtually every

11  aspect of his business, he was not involved in developing the terms and conditions

12  of the insurance policies he marketed and sold   Temple did not have anything to do

13  with designing Allstate's policies, setting the rates, or determining the deductibles,

14  those tasks were handled by other Allstate employees   (Temple Dep  at 496 22 –

15  497 4 )

16  **B.    Temple's Overtime Claims should be Dismissed to the Extent they are
    Barred by the Applicable Statutes of Limitation.**

17

18       Temple's claims for overtime should be dismissed to the extent they are

19  barred by the applicable statutes of limitation   Temple's FLSA claims are subject to

    a two-year statute of limitations [7]  29 U S C  § 255(a)  His claims under the MWA
20
    are subject to a three-year statute of limitations   See SPEEA v  Boeing Co , 139
21
    Wn 2d 824, 837, 991 P 2d 1126 (2000)  As a result, any claims under the FLSA for
22
    overtime pay allegedly earned before March 8, 1999 (two years before the
23
    Complaint in this case was filed) are barred   Similarly, any claims under the MWA
24

25
    _____
    [7] A three-year statute of limitation applies under the FLSA if the misclassification is willful
26  29 U S C  § 255  However, there is no evidence in this case that Allstate's classification of
    Temple as an exempt administrative employee was willful

Defendant Allstate's Motion for Summary Judgment,                    Riddell Williams P S
Case No  C01-5124 - Page 23                                   1001 FOURTH AVENUE PLAZA
                                                                        SUITE 4500
291/320177 02                                                  SEATTLE, WA  98154-1065
082002/1241/42496 00103                                            (206) 624-3600

1  for overtime pay allegedly earned before March 8, 1998 are barred

2  **C.    Temple was an Exempt Administrative Employee.**

3      The FLSA and MWA generally require employers to pay employees 1 5

4  times their regular hourly wage for all hours worked over 40 in a workweek   29

5  U S C  § 207, RCW 49 46 130   However, both statutes contain exemptions from

6  this requirement for certain workers, including executive, professional, and

7  administrative employees   See 29 U S C  § 213(a)(1), RCW 49 46 010(5)(c)

8  Temple was an exempt administrative employee under the FLSA and MWA

9      There are two tests for determining whether an employee is an exempt

10  administrative employee – the "short test" and the "long test "  See 29 C F R  §

11  541 2, WAC 296-128-520   The "short test" applies when an employee earns more

12  than $250 per week  Id  In this case, it is undisputed that Temple earned a

13  minimum monthly salary of $1,500, or $375 per week (though he earned

14  significantly more)   As a result, the "short test" applies

15      The short test consists of the following requirements

16      (1)    the employee is paid on a salary or fee basis at a rate of not less than
17              $250 per week,

18      (2)    the employee's primary duty consists of the performance of office or
              non-manual work directly related to management policies or general
19              business operations of his employer or his employer's customers, and

20      (3)    the employee's work requires the exercise of discretion and
              independent judgment

21  29 C F R  § 541 2, WAC 296-128-520   Temple's employment met each of these

22  requirements

23      1    **Temple was Paid on a Salary or Fee Basis.**

24      Allstate paid Temple commissions on his sales but also guaranteed him a

25  certain monthly minimum amount of pay   This compensation arrangement satisfies

26  the salary basis test, which requires that the employer pay a predetermined amount

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 24
291/320177 02
082002/1237/42496 00103

1   on a weekly or less frequent basis, and that the amount is not subject to reduction

2   based on the quantity or quality of the work performed [8]  29 C F R  §§ 541 118,

3   541 212  The salary basis test is satisfied by a commission compensation system

4   that includes a minimum compensation guarantee that meets or exceeds the

5   threshold amounts under the regulations (the equivalent of $250 per week, in the

6   case of the short test)  See 29 C F R  § 541 118(b)  This regulation describes

7   "precisely" the compensation system for Allstate NOAs  Hogan, 2002 WL 1396846

8   at *4, see also Wilshin, 2002 WL 1474092 at *11  During the relevant time period,

9   Allstate guaranteed that Temple would be paid at least $1,500 per month,

10  regardless of the commissions he earned  As a result, Temple was paid on a "salary

11  basis" within the meaning of the FLSA and MWA [9]

12      2      **Temple's Job Duties were Those of an Administrative Employee.**

13  Temple also performed exempt administrative duties as an NOA  An

14  employee satisfies the second part of the administrative exemption test where the

15  employee's primary duty consists of the performance of office or non-manual work

16  directly related to management policies or general business operations of his

17  employer or his employer's customers   29 C F R  § 541 2, WAC 296-128-520  The

18  phrase "directly related to management policies or general business operations"

19  refers to activities that relate to the administrative, as distinguished from production,

20  operations of a business, and are "of substantial importance to the management or

21  operations of the business "  29 C F R  § 541 205(a)  Work that is "directly and

22  [8] The Washington Administrative Code does not contain a regulation defining "salary or fee
23  basis "  However, the MWA often is interpreted by reference to the FLSA  Tift v
    Professional Nursing Servs , Inc , 76 Wn  App  577, 886 P 2d 1158 (1995)

24  [9] Temple's compensation system also constitutes compensation on a "fee basis," which can
    apply in lieu of the salary basis for an exempt employee  See Herr v  McCormick Grain-
25  Heiman Co , Inc , No  92-1321, 1994 WL 544513, at *3 (D  Kan  Sept  13, 1994), rev'd and
    vacated on other grounds, 75 F 3d 1509, 1513-14 (10th Cir  1996) (commission salesman
26  paid on fee basis), see also 29 C F R  §§ 541 213, 541 313(b), Fazekas v  The Cleveland
    Clinic Fdn  Health Care Ventures, Inc , 204 F 3d 673, 676-79 (6th Cir  2000)

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 25
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   closely related" to the performance of exempt administrative work is also exempt
2   within the meaning of the regulations   See 29 C F R § 541 208

3       Temple performed "administrative" work under this definition   The
4   regulations interpreting the administrative exemption define administrative work as
5   including  (1) promoting sales, (2) representing the company; (3) planning, and (4)
6   advising and counseling customers   29 C.F R § 541 205(b)   As one of Allstate's
7   primary contact points with the insurance market, Temple engaged in all of these
8   activities   He promoted sales of the company's products through his own marketing
9   and advertising strategies   He represented Allstate to his customers, solving their
10  problems without the assistance of Allstate management and advising them on
11  Allstate's products   Finally, he was responsible for managing the affairs of his own
12  Allstate agency   As the Hogan and Wilshin courts held, these activities constitute
13  exempt administrative work   Hogan, 2002 WL 1396846 at *9, Wilshin, 2002 WL
14  1474092 at *12-14

15      In addition, Temple's work was of "substantial importance to the
16  management or operation of the business of [the] employer or [the] employer's
17  customers "  29 C F R § 541 205(a)   Persons performing work of 'substantial
18  importance' include those      who either carry out major assignments in conducting
19  the operations of the business, or whose work affects business operations to a
20  substantial degree     " 29 C F R § 541 205(c)   Whether work is of substantial
21  importance depends on the nature of the work, rather than just its consequences
22  Reich v  John Alden Life Ins  Co , 126 F 3d 1, 11 (1st Cir 1997)   Among the
23  examples in the regulations of positions that meet the "substantial importance" test
24  are credit managers, claims agents and adjusters, account executives of advertising
25  agencies, securities brokers, and promotion men   29 C F R § 205(c)(5)

26      NOAs' duties are "substantially important" to the operation of Allstate's

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1    business   Hogan, 2002 WL 1396846 at *10   The activity of NOAs such as Temple

2    in "promot[ing] sales, maintain[ing] customer relations to increase chances of

3    renewals, and decid[ing] on which policies to promote in order to fit customers'

4    specific needs" is work of substantial importance to Allstate   Id   Temple's work in

5    identifying customer needs and advising them on Allstate's products is also work of

6    substantial importance

7         Finally, Temple's work was on the administrative, and not the production,

8    side of Allstate's business   See Hogan, 2002 WL 1396846 at *8-9; Wilshin, 2002

9    WL 1474092 at *12-14   The "products" of insurance companies like Allstate are the

10   insurance policies themselves   Reich, 126 F 3d at 9, Hogan, 2002  WL 1396846 at

11   *8-9, Wilshin, 2002 WL 1474092 at *12-14   Employees who "are in no way involved

12   in the design or generation of insurance policies, the very product 'that the

13   enterprise exists to produce and market,'      cannot be considered production

14   employees "  Reich, 126 F 3d at 9, see also Hogan, 2002 WL 1396846 at *8-9,

15   Wilshin, 2002 WL 1474092 at *12-14   Temple himself admits that he had nothing to

16   do with designing or creating the Allstate policies he sold, setting the rates for those

17   policies, or determining the deductibles   Temple performed administrative, and not

18   production, work

19        3    **Temple Exercised Discretion and Independent Judgment.**

20        Temple also satisfies the third requirement for the administrative exemption,

21   that his employee's primary duty included "work requiring the exercise of discretion

22   and independent judgment "  See 29 C F R  § 541 2(e)(2)   The exercise of

23   discretion and independent judgment "involves the comparison and the evaluation

24   of possible courses of conduct and acting or making a decision after the various

25   possibilities have been considered "  29 C.F R  § 541 207(a)  The concept "implies

26   that the person has the authority or power to make an independent choice, free

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 27
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   from immediate direction or supervision and with respect to matters of significance "

2   Id  However, "it does not necessarily imply that the decisions made by the

3   employee must have the finality that goes with unlimited authority and a complete

4   absence of review "  29 C F R  § 541 207(e)   "The fact that an employee's decision

5   may be subject to review    does not mean that the employee is not exercising

6   discretion and independent judgment "  Id , see also Dymond v  U S  Postal Serv ,

7   670 F 2d 93, 95 (8th Cir  1982), Spinden v  GS Roofing Prod  Co , 94 F 3d 421,

8   428-29 (8th Cir  1996)   The standard to determine whether an employee exercises

9   sufficient discretion is lenient, requiring that job duties simple "include" discretion

10  and that the employee have the opportunity to exercise it "occasionally "  29 C F R

11  § 541 2(e)(2), Dymond, 670 F 2d at 95

12          Temple exercised substantial discretion and independent judgment in the

13  execution of his duties   He determined his own sales methods and used

14  professional discretion in determining which insurance products met his customers'

15  needs   He used his independent judgment to determine which marketing and

16  advertising strategies to use and the amount of money he was willing to commit to

17  these strategies   Temple also made his own decisions about whether to hire

18  support staff and the terms and conditions under which they would operate   It was

19  even Temple's decision to implement a particular strategy in order to turn customer

20  service contacts into future renewals  Temple exercised far more than the limited

21  discretion and independent judgment necessary to satisfy the administrative

22  exemption  See Hogan, 2002 WL 1474092 at *11, Wilshin, 2002 WL 1474092 at

23  *15

24          In sum, the undisputed facts show that Temple was exempt from the

25  overtime requirements of the FLSA and MWA   Temple was paid on a salary basis,

26  performed work of substantial importance to Allstate, worked on the administrative

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 28
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   side of Allstate's business, and exercised independent judgment and discretion in
2   carrying out his duties   Temple, like the NOA plaintiffs in Wilshin and Hogan, was
3   an exempt administrative employee under the FLSA and MWA.

## VI.  ALLSTATE IS ENTITLED TO SUMMARY JUDGMENT ON TEMPLE'S CLAIMS THAT ALLSTATE FAILED TO ACCOMMODATE HIS ALLEGED DISABILITY IN VIOLATION OF WLAD AND THE ADA.

6       Temple also claims that Allstate failed to accommodate his alleged disability
7   in violation of the WLAD and the ADA   These claims relate to Allstate's
8   implementation in 1999 of "Agency Standards," which were adopted in an effort to
9   improve customer service and meet competitive demands   The Standards required
10  every Allstate agency to maintain specific business hours and have a licensed staff
11  member in the office during those hours   Temple claims that Allstate should have
12  accommodated his alleged disability by either (1) allowing him to close or leave his
13  office during the required business hours without arranging for coverage by licensed
14  staff, or (2) allowing him to combine offices with other agents who could have
15  covered for him during his absences

16      However, the undisputed facts establish that Temple was not even covered
17  by the ADA or WLAD during much of the time at issue, and when he was arguably
18  covered, Allstate met its obligations under those laws   Temple did not have a
19  "disability" during the initial period of time at issue, and by January, 2000, he was
20  not a "qualified individual with a disability" covered by the ADA or WLAD, because
21  he could not work at all   During the only time period when Temple arguably was a
22  qualified individual with a disability—between May 26, 1999 and January 2000—he
23  did not give Allstate sufficient notice that he required accommodation   Even if he
24  had given adequate notice, Allstate already was providing Temple with one of the
25  two requested accommodations and was not required to provide the other   For all
26  these reasons, Allstate is entitled to summary judgment dismissing Temple's

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 29
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1  disability claims

2  **A.    Undisputed Facts Related to this Claim.**

3  **Agency Standards**

4      In addition to the changes in the structure of Allstate's agency force

5  discussed in section IV above, during 1998 through 2000, Allstate made other

6  changes designed to improve its level of customer service and to meet competitive

7  pressures and demands  (Hutton Decl ¶ 21 )  As Allstate evaluated the market for

8  insurance services and customer needs, it concluded that it needed to be able to

9  offer its customers and prospective customers greater and more consistent access

10  to licensed agents or support staff who could handle all of the customer's insurance

11  needs  (Id )  Prior to 1998, Allstate began encouraging its agents to provide

12  improved levels of customer service through its "Guiding Principles "  (Id )  Under

13  these Guiding Principles, agents were encouraged to keep their offices open from 9

14  to 5 on weekdays, open their offices on Saturdays, and to have licensed staff in the

15  office during all office hours  (Id )  Allstate also offered incentives to agents in

16  "Premier Services Agencies," who agreed to meet certain service standards,

17  including keeping the agency open and staffed with licensed staff during extended

18  hours on weekdays and on Saturdays  (Id )

19      As competitive pressures and customer expectations continued to increase,

20  and in an effort to establish more consistent countrywide standards for Allstate

21  service levels, Allstate announced on August 31, 1998, a set of new "Allstate

22  Agency Standards "[10]  (Hutton Decl ¶ 22 )  These Agency Standards incorporated

23  many of the principles already contained in the Guiding Principles, and being met by

24

25

---

26  [10] A copy of the relevant portion of the standards is attached as Exhibit D to the Hutton
Decl

Riddell Williams P s
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   Premier Service Agencies, but made these principles mandatory for every Allstate

2   agency countrywide   (Id )

3          The Agency Standards required all Allstate agencies to be open from 9.00

4   a m  to 6:00 p m  on weekdays beginning January 1, 1999, and from 9 00 a m  to

5   1 00 p m. on Saturdays, as of July 1, 1999, excluding company-approved holidays

6   (Hutton Decl ¶ 23 )  The Agency Standards also required all agencies to ensure

7   that a licensed professional was present during all office hours, effective July 1,

8   1999, although some regions, including Seattle, implemented this last requirement

9   prior to that time   (Id )  The Agency Standards did not require Temple or any other

10  Allstate agent to be in his or her offices during any particular hours—the schedule

11  the agent worked was left to the agent's discretion—but they did require the agent

12  to keep the office open during the required hours and staffed by someone who was

13  licensed under state law to perform critical customer services such as providing

14  quotes, binding coverage, collecting premiums, and answering customer questions

15  (Id )  Allstate considered it critical that each of its agents meet these standards, so

16  that it could both advertise and deliver the high level of customer service that

17  Allstate's customers deserved and market conditions demanded   (Id.)

18          There were numerous ways that an agent could satisfy the Agency

19  Standards' licensed staff requirement, including hiring part-time licensed help or

20  obtaining licensed support staff on a temporary basis   (Hutton Decl ¶ 24 )  Even

21  before the Agency Standards were announced, many agents employed licensed

22  staff because that allowed them to provide better customer service and to generate

23  higher sales   (Id )  After the new Agency Standards were announced, many

24  additional agents hired licensed staff, or helped existing unlicensed staff become

25  licensed, to meet the requirements   (Id )  Agents had an Office Expense Allowance,

26  or OEA, to use for the purpose of hiring and licensing support staff, among other

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 31
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1  things  (Poulter Decl ¶ 4 )  In addition to the OEA, Allstate offered agents financial

2  incentives after implementation of the Agency Standards in exchange for getting

3  staff licensed  (Id at ¶ 5 )

4      Temple admitted in his deposition that  the Agency Standards applied to all

5  employee agents and were consistently enforced  (Temple Dep  at 222 19-23,

6  223 13-17 )  As described below, Temple's problems in meeting these Agency

7  Standards did not stem from a disability, but from the fact that he worked in a single

8  agent office and never hired any licensed support staff

9  **Temple's Condition During First Time Period: November 1998 - May 26, 1999**

10     Temple's physical and mental condition varied during the time at issue in this

11  case  For purposes of this Motion, the allegations relating to Temple's condition

12  can be broken down into three time periods, the first of which began when Temple

13  returned to work after a paid leave of absence following a heart attack in September

14  1998  (Temple Dep  at 250 5-9, 251 10-17, 253 20-24, Deposition of Dr  John

15  Petersen ("Petersen Dep ") at 13 3-12, 14 7-13, 15 6-11, Ex  2 )[11]  At the end of

16  Temple's leave, in early November 1998, his treating cardiologist, Dr. Petersen,

17  released Temple to return to work and resume full occupational duties  (Petersen

18  Dep  at Ex  4, Temple Dep  at 300 13-25)  Temple acknowledged in his deposition

19  that he was fully able to do his job when he returned to work after his heart attack

20  (Temple Dep  at 285  5-10 & 14-19 )  Temple's cardiologist did not place any

21  restrictions on his ability to work during subsequent visits in November 1998 and

22  January 1999  (Petersen Dep  at 54 5-11, 56 15-25 )

23  **Temple's Condition During Second Time Period: May 26, 1999 – January 2000)**

24     There is no evidence that Temple's condition changed until at least May

25  1999  About one month earlier, on April 13, 1999, Temple sent a letter to Allstate's

26

[11] Excerpts of the Petersen Dep  are attached as Exhibit 5 to the Jones Decl

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 32
291/320177 02
082002/1237/42496 00103

Riddell Williams ps
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   Regional Human Resources Manager entitled "Request for Reasonable
2   Accommodation Under ADA " (Temple Dep at 318 2-5 and Ex 10 ) In that letter,
3   Temple requested "an adjustment in [his] work schedule" due to his "Heart Attack
4   with blockage and stress " (Id ) Debbie Cooper, an Allstate Human Resources
5   Division Manager, responded by letter dated May 4, 1999 and requested "some
6   additional information from [Temple's] physician in order to verify the existence of
7   an [ADA] disability and the need for a reasonable accommodation " (Deposition of
8   Debbie Cooper ("Cooper Dep ") at 118 8-22 and Ex 2,[12] Temple Dep at 326 14-18,
9   Ex 11 ) Cooper enclosed a form for Temple's doctor to complete (Cooper Dep at
10  123 21 – 124 4, Temple Dep at 326 19 – 327 2 and Ex 11 )

11         Temple saw Dr James Geren, an internist, on May 26, 1999 (Deposition of
12  Dr James Geren ("Geren Dep ") at 17 1-2, Ex 3 excerpt at p 53 )[13] Dr Geren
13  completed the form, indicating that Temple had coronary artery disease, but that the
14  condition did not limit Temple's activities (Id at 34 5-15 and Ex 4, Temple Dep at
15  327 3-6 ) Dr Geren also indicated that Temple had been diagnosed with anxiety
16  and depression on May 26, 1999, but that those conditions did not limit Temple's
17  activities in any way either (Geren Dep at 41 7-10, 43 6-10, Ex 4 ) Dr Geren also
18  stated that Temple needed to participate in an exercise rehab program and stress
19  reduction classes "during the work week " Id Dr Geren returned the completed
20  form to Allstate (Temple Dep at 327 11-23 )

21         Dr Geren's note did not notify Allstate that Temple required any change in
22  his job, because it did not indicate that Temple needed to participate in the program
23  or take classes during work hours, or that he needed to change his work schedule
24  (See Geren Dep at 41 7-10, 43 6-10, Ex 4 ) Accordingly, Cooper responded in an

25
26  [12] Excerpts of the Cooper Dep are attached as Exhibit 6 to the Jones Decl
    [13] Excerpts of the Geren Dep are attached as Exhibit 7 to the Jones Decl

Defendant Allstate's Motion for Summary Judgment,
Case No C01-5124 - Page 33
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA 98154-1065
(206) 624-3600

1 | August 11, 1999 letter to Temple

2 | We question why you would require a change in your work schedule in any event to participate in an exercise or stress reduction program
3 | Such activities may be scheduled before or after your work day
Moreover, because you have discretion with respect to how you spend
4 | your work day, it would seem that it would be possible for you to
schedule such activities during your agency's office hours as long as
5 | you ensure that your office will be staffed by a licensed professional in
accordance with Allstate's Service Availability Standards
6 |
(Cooper Dep at 143 22-25, Ex 5 (emphasis added) )

7 | According to Temple, there were only two occasions after Dr Geren's June 6

8 | note, and before he became totally disabled, when he allegedly notified Allstate that

9 | his medical condition required accommodation   (See Plaintiff's Third Supplemental

10 | Responses to Defendant's First Interrogatories and Requests for Production at 5 )[14]

11 | First, Temple claims he requested accommodation in an August 23, 1999 letter to

12 | Debbie Cooper   But that letter said nothing about accommodation, and was simply

13 | a response from Temple asking Cooper to write to him on official Allstate

14 | letterhead [15]   Second, Temple alleges he called Allstate manager Rob Fowler on

15 | November 1, 1999 to request an accommodation   However, there is no evidence

16 | that any such phone call took place, even in the extensive phone records that

17 | Temple produced from his office

18 | **Temple's Condition During Third Time Period: January through June 2000**

19 | Beginning in January 2000, Temple was totally disabled and could not work

20 | with or without accommodation   In January 2000, Temple began seeing Dr

21 | Franklin Walker, a clinical psychiatrist   (Deposition of Dr Franklin Walker ("Walker

22 | Dep ") at 14 12-13, 16 11-16, 17 15-16 )[16]   Dr Walker examined Temple and

23 | concluded that Temple was unable to work and could not have performed any job at

24 |
[14] Excerpts from Plaintiff's Third Supplemental Responses are attached as Exhibit 8 to the
25 | Jones Decl

26 | [15] A copy of Temple's August 23, 1999 letter is attached as Exhibit 9 to the Jones Decl
[16] Excerpts from the Walker Dep are attached as Exhibit 10 to the Jones Decl

Defendant Allstate's Motion for Summary Judgment,
Case No C01-5124 - Page 34
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA 98154-1065
(206) 624-3600

1  that time  (Id. at 50 13-15 )  Dr Walker saw Temple regularly until approximately

2  June 1, 2001, and never changed his opinion that Temple was completely unable to

3  work  (Id. at 50 24-51 19; 81 13-15 )  Dr Walker also believed that there was no

4  accommodation by Allstate that would have allowed Temple to do his job  (Id. at

5  52 5-11 )

6  Like Dr Walker, Dr Geren also believed that Temple was unable to perform

7  his job, either with or without accommodation, as of early 2000  (Geren Dep at

8  58 9-12 )  Accordingly, Dr Geren completed a Family and Medical Leave request

9  form on Temple's behalf, which declared that Temple was "unable to perform work

10  of any kind "  (Id. at 58 16-24, Ex 7 at ¶ 7a )  Dr Geren confirmed his opinion that

11  Temple was totally unable to work on May 25, 2000, when he completed an

12  Application for Long Term Disability Income Benefits for Temple  (Id. at 67 20-25,

13  Ex 9 )  Dr Geren testified during his deposition that at the time he completed this

14  form, Temple was unable to work indefinitely, and no accommodation by Allstate

15  could change that  (Id. at 68 22 – 69 15 )

16  Temple himself declared in a May 2000 application for disability benefits that

17  although his health conditions first bothered him on August 28, 1998, he first

18  became unable to work on January 12, 2000  (Temple Dep at 464 4-15, Ex 26 )

19  **B.    The Undisputed Facts Establish that Temple was Not Disabled within
       the Meaning of WLAD or ADA During the First Time Period.**

20

21  To establish a prima facie case of failure to accommodate under the ADA, a

22  plaintiff must prove (1) that he or she is disabled within the meaning of the ADA, (2)

23  that he or she is qualified to perform the essential functions of the job, with or

24  without reasonable accommodation, and (3) the employer took an adverse

25  employment action against him or her because of that disability or failed to

26  accommodate the disability  See Kennedy v Applause, 90 F 3d 1477, 1481 (9th

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 35
291/320177 02
082002/1237/42496 00103

Riddell Williams p s
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   Cir 1996) Similarly, to establish a prima facie case of disability discrimination

2   under the WLAD, a plaintiff must show that (1) he or she was "disabled" within the

3   meaning of the Act, (2) he or she was qualified to perform the essential functions of

4   the job with or without reasonable accommodation, (3) he or she gave the

5   employer notice of the disability and its accompanying substantial limitations, and

6   (4) upon notice, the employer failed to reasonably accommodate the employee <u>Hill</u>

7   <u>v BCTI Income Fund</u>, 144 Wn 2d 172, 193, 23 P 3d 440 (2001)

8           Temple cannot establish the first element of his case—that he was "disabled"

9   —for the first time period at issue There is simply no evidence that Temple was

10   disabled under either WLAD or ADA from the time he returned to work after his

11   heart attack until his visit with Dr Geren on May 26, 1999, at the earliest

12           A plaintiff has a disability under the WLAD if he has a sensory, mental, or

13   physical abnormality that has a substantially limiting effect upon his ability to

14   perform his job   <u>Pulcino v Federal Express Corp</u>, 141 Wn 2d 629, 641, 9 P 3d

15   787 (2000)   The ADA's definition of disability requires a plaintiff to show that he has

16   "a physical or mental impairment that substantially limits one or more of [his] major

17   life activities[,]" which include functions "such as caring for oneself, performing

18   manual tasks, walking, seeing, hearing, speaking, breathing, learning and working "

19   42 U S C § 12102(2)(A), 29 C F R § 1630 2(i)   An individual must have an

20   impairment that prevents or severely restricts the individual from doing activities that

21   are of central importance to most people's daily lives   See 29 CFR §1630 2(j)(2)(ii)

22   (2001), <u>Toyota Motor Mfg , Ky , Inc v Williams</u>, 534 U S 184, 122 S. Ct 681, 691

23   (2002)   With regard to the major life activity of working, the term "substantially

24   limits" means significantly restricted in the ability to perform either a class of jobs or

25   a broad range of jobs in various classes as compared to the average person having

26   comparable training, skills and abilities   29 C.F R § 1630 2(j)(3)(i)

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 36
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA 98154-1065
(206) 624-3600

1        Temple cannot meet the WLAD disability standard, much less the ADA's, for

2 the first time period at issue, because there is no evidence that his heart condition

3 "substantially limited" his ability to perform his job as an agent.  Dr. Petersen

4 released Temple to resume full occupational duties as of November 2, 1998  Until

5 at least May 1999, there were no restrictions at all on Temple's work duties

6 Temple has no evidence that his heart condition—or any other condition—limited

7 his ability to work or engage in other major life activities between November 1998

8 and May 26, 1999  The Court should dismiss any disability claims by Temple based

9 on this time period

10 **C.  The Undisputed Facts Establish that Allstate Did Not Have Any Duty to**

11 **Accommodate Temple after January 2000 because He was Totally Disabled and Not a Qualified Individual with a Disability.**

12        Similarly, any reasonable accommodation claims by Temple for the third time

13 period (January through June 2000) must fail  Temple cannot satisfy the second

14 requirement for a prima facie case as to this period, because he was unable to work

15 and thus was not a "qualified individual" with a disability  A "qualified individual with

16 a disability" is a person who, with or without reasonable accommodation, can

17 perform the essential functions of [his or her] job  Weyer v  Twentieth Century Fox

18 Film Corp , 198 F 3d 1104, 1108 (9th Cir. 2000) (quoting Cleveland v  Policy Mgmt

19 Sys  Corp , 526 U S  795, 806 (1999) (quoting the ADA))  A totally disabled plaintiff

20 cannot establish that he is a "qualified individual" because there is no genuine issue

21 of fact that he could have performed the job with the proposed, or any other,

22 accommodation  Id  at 1108-09; Kennedy, 90 F 3d at 1481-82

23        The undisputed evidence demonstrates that Temple was unable to perform

24 his job as an NOA, with or without accommodation, as of January 12, 2000  He

25 therefore was not a "qualified individual" under the ADA  Since January 2000, no

26 doctor has ever told Temple that he was able to return to work, either with or without

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 37
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA 98154-1065
(206) 624-3600

1   accommodation   (Temple Dep  at 467 16-19, 469 1-5 )  Consequently, any

2   reasonable accommodation claims after January 12, 2000 should be dismissed

3   **D.     To the Extent that Allstate Had a Duty to Accommodate Temple During the Latter Months in 1999, It Met Its Duty as a Matter of Law.**

4       The only time period when Temple arguably was a qualified individual with a

5   disability was the time from May 26, 1999 until January 12, 1999  Although Allstate

6   does not concede that Temple was a qualified individual with a disability during this

7   period, its motion is based on the undisputed facts that (1) Allstate did not have

8   notice that Temple had a disability that required accommodation at any time during

9   1999, and (2) Allstate already was providing one of the two accommodations

10  Temple claims Allstate should have made (time to leave the office during the work

11  day), and was not required to provide the other (forcing other agents to share an

12  office with Temple)

13

14      1     **Dr. Geren's June 1999 Note Did Not Put Allstate on Notice that Temple Had a Disability that Required Accommodation.**

15      Allstate did not have a duty to accommodate Temple's alleged disability,

16  because it never had notice that Temple's condition required accommodation

17  Under WLAD, an employee must give notice to his or her employer that she has a

18  disability *requiring* accommodation  Snyder v  Medical Serv  Corp  of E  Wash , 98

19  Wn  App  315, 326, 988 P 2d 1023 (1999), aff'd 145 Wn 2d 233, 35 P.3d 1158

20  (2001) (emphasis added)  Where an employee gives notice that he has a disability

21  but there is no indication that the disability requires accommodation, the

22  employer's duty goes no further  Lindblad v  Boeing, 108 Wn  App  198, 205-06,

23  31 P 3d 1 (2001)  "[N]o duty arises unless there is a need for accommodation "  Id

24  at 205 (quoting Maxwell v  Dep't of Corrs , 91 Wn  App  171, 180, 956 P 2d 1110

25  (1998) (emphasis added))  Similarly, under the ADA, the employee has a duty to

26  give the employer notice that he or she has a disability that requires

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 38
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   accommodation   Reed v LaPage Bakeries, Inc., 244 F 3d 254, 261 (1st Cir

2   2001)   The employee's request must be "sufficiently direct and specific," giving

3   notice that she needs a "special accommodation "  Id  (citing and quoting Second

4   and Third Circuit decisions)

5   No such notice was ever given in this case   Dr  Geren's June 1999 note

6   indicated only that Temple was unrestricted in his ability to work, and simply needed

7   to participate in an exercise rehab program and stress reduction classes "during the

8   work week "  Employers are not obligated "to provide disabled employees with

9   medically unnecessary accommodations." Hill, 144 Wn 2d at 193 (emphasis in

10  original)  Because the information Dr  Geren provided did not indicate that any

11  change to Temple's job duties or environment was required, it was insufficient as a

12  matter of law to put Allstate on notice that Temple had a disability requiring

13  accommodation

14       2       **Temple Did not Do Anything to Put Allstate on Notice that his**
           **Medical Condition Required an Accommodation after Providing**
15         **Dr. Geren's Note.**

16  Between May 26, 1999, when he saw Dr  Geren, and January 2000, when

17  Temple's physicians concluded that he was totally disabled and unable to work at

18  all, Allstate was never notified of any change in Temple's condition that required

19  accommodation

20  Allstate anticipates that Temple will claim he put the company on notice of a

21  need for accommodation in two communications to the company between August

22  and November 1999   The first communication is Temple's August 23, 1999 letter to

23  Debbie Cooper   However, no reasonable person could conclude that the letter put

24  Allstate on notice of a condition requiring accommodation, because all Temple said

25  in the letter was that Cooper should write to him on official Allstate letterhead

26  Similarly, no reasonable person could conclude that the second communication put

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 39
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1  Allstate on notice of Temple's need for accommodation, because Temple's own

2  evidence contradicts his allegation on this point  Although Temple claims he made

3  the call to Fowler, it is not reflected anywhere in his extensive telephone records,

4  and Temple did not include it in his original response to an Interrogatory that

5  specifically requested this information  (See Jones Decl, Ex 11 )[17]

6      In summary, the <u>only</u> information Allstate had regarding Temple's alleged

7  need for accommodation between May 26, 1999 and January 2000 was Geren's

8  June 6, 1999 note  That note was insufficient to put Allstate on notice that Temple's

9  disability required accommodation as a matter of law

10     3    **Even if Allstate was on Notice that Temple Could Work Only With**
       **a Change to the Standards, It Satisfied Its Duty to Provide**
11        **Reasonable Accommodations.**

12         a    **The Agency Standards Provided Accommodation by**
            **Allowing Agents to Leave their Offices as Long as They**
13             **Provided Coverage by Licensed Staff.**

14     Even assuming Temple was disabled and that he provided adequate notice

15 in 1999 of his alleged need for accommodation, the Standards already provided the

16 accommodation that Temple claims he required  The Standards obligated agencies

17 to be open with licensed staff available during specific hours on certain days, and

18 categorically applied to all Allstate agents  <u>However, the Standards did not require</u>

19 <u>agents to work any particular hours or to remain in their offices during the hours</u>

20 <u>when the agency was required to be open</u>  Agents who needed to be away from

21 the office could comply with the Standards by hiring licensed staff and arranging for

22 them to be present while the agent was away  Thus, the record demonstrates that

23 the Standards provided the very accommodation Temple requested  the ability to

24 leave the office

25

26 [17] Temple did not supplement his prior response to Interrogatory No  7 until after his
deposition was complete  (Jones Decl, Ex 11)

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 40
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA 98154-1065
(206) 624-3600

1    In Lindblad v Boeing Co , the Washington State Court of Appeals affirmed

2  the dismissal of an employee's WLAD reasonable accommodation suit because the

3  "accommodation" that the employee claimed to need could be obtained without

4  requiring the employer to make any changes   108 Wn App at 204-06   Similarly

5  here, the Court should dismiss Temple's claim   While Temple may claim that he

6  could not leave the office because he did not have licensed staff, it is undisputed

7  that it was his inability or unwillingness to hire licensed staff—not his disability—that

8  prevented him from leaving the office   Allstate had a duty to accommodate Temple

9  only if Temple actually needed accommodation due to a disability   See id at 205

10  Temple cannot make that showing

11                    b    **Allstate Was Not Obligated to Force Agents to Combine
                           Offices with Temple.**

12     Temple also claims that Allstate should have accommodated his inability to

13  be in the office during established hours by helping him to combine offices with

14  other agents   In particular, he claims that he wanted to combine offices with any of

15  the other agents in the vicinity   Barry Koehler, Helen Elwood, or Dwight Bondy and

16  Craig Brown, who already shared an office   However, none of these other agents

17  wanted to combine with Temple

18     Although Temple names Barry Koehler as someone with whom he could

19  have shared an office, Temple admitted in his deposition that plans to combine

20  offices with Koehler fell apart because of location   (Temple Dep at 46 3-8, 48 18 –

21  49 1, 83 12 – 86 10 )  Elwood did not want to combine offices with Temple

22  (Declaration of Helen Elwood ¶ 5 )  Brown told Allstate manager Rollie Poulter that

23  he and Bondy did not want to combine with Temple either because they did not like

24  Temple personally   (Poulter Decl ¶ 3 )  Bondy also Poulter that he did not like

25  Temple's negative personality, or the way Temple handled clients   (Id )

26

Ruddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE  WA  98154-1065
(206) 624-3600

1   Consequently, while Allstate did not object to Temple's request to combine offices, it
2   had no way of making that happen short of forcing agents who did not want to share
3   an office with Temple to do so against their will.

4       Although Temple apparently contends that Allstate was obligated to force
5   other agents to share an office with him, that contention flies in the face of EEOC
6   Guidelines and well-established case law   An accommodation that adversely
7   impacts other employees' ability to do their jobs is an undue burden on the
8   employer   See 29 C F R § 1630 2(p)(2)(v), Mears v  Gulfstream Aerospace Corp.,
9   905 F  Supp. 1075, 1081 (S D  Ga  1995), aff'd 87 F 3d 1331 (11th Cir  1996),
10  Turco v  Hoechst Celanese Corp., 101 F.3d 1090, 1094 (5th Cir  1996), Milton v
11  Scrivner, Inc., 53 F 3d 1118, 1125 (10th Cir 1995)  Accordingly, this Court should
12  dismiss Temple's claim that Allstate had a duty to accommodate his alleged
13  disability by forcing other agents to combine offices with him

14  **E.**   **Temple Could Not Perform an Essential Function of the Job If He Left or**
15        **Closed His Office Without Providing Licensed Staff During His**
      **Absence.**

16      Even if Temple could establish that he was disabled and that his disability
17  prevented him from meeting Agency Standards, he nonetheless cannot maintain a
18  failure to accommodate claim against Allstate   Allstate was not required, as a
19  matter of law, to change its Standards to accommodate Temple's alleged disability
20  because meeting those Standards by maintaining the required office hours was an
21  essential function of Temple's job   Under applicable federal and Washington law, an
22  employee who cannot perform an essential function of his job due to a disability is
23  not a "qualified individual with a disability" and is not entitled to the protections of the
24  disability laws

25      As described above, Temple was not a "qualified individual with a disability"
26  protected by the ADA and the WLAD unless he could perform the essential

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 42
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   functions of the job with or without reasonable accommodation   To determine

2   whether a job function is essential, the initial inquiry is whether an employer actually

3   requires all employees in the particular position to perform the allegedly essential

4   function  29 C F R  Pt  1630, App  § 1630 2(n), Milton, 53 F 3d at 1124   An

5   employer's judgment is also relevant evidence to be considered  42 U S C §

6   12111(8)  In the absence of discriminatory animus, courts generally give

7   "substantial weight" to the employer's judgment about what functions are essential

8   Kvorjak v  Maine, 259 F 3d 48, 55 (1st Cir  2001)  The same essential function

9   analysis applies under the WLAD  See, e g , Clarke v  Shoreline School Dist , 106

10  Wn 2d 102, 119, 720 P 2d 793 (1986)  Where a disabled employee cannot perform

11  an essential function of the job with or without accommodation, that employee is not

12  a "qualified individual" under the ADA and therefore does not need to be

13  accommodated  See Kees v  Wallenstein, 161 F 3d 1196-1199 (9th Cir  1998)

14       Providing licensed staff during the office hours required by the Agency

15  Standards was an essential function of the agent position  It is undisputed that all

16  agents were required to comply with the Standards once they went into effect

17  (Hutton Decl  ¶ 22 )  Allstate established this requirement because it made the

18  business judgment, after first experimenting with various voluntary programs,  that it

19  needed to establish consistent countrywide standards to meet competitive

20  pressures and customer demands  (Id  at ¶¶ 21-22 )  Allstate considered it critical

21  that each of its agents meet these standards so that it could both advertise and

22  deliver the high level of customer service that its customers deserved and market

23  conditions demanded  (Id  at ¶ 23 )  Temple was informed, and understood, that all

24  agents were required to meet the Standards  (Temple Dep  at 222 19 – 23, 223 13-

25  17.)  For all of these undisputed reasons, maintaining regular business hours with

26  licensed staff available at all times was an essential function of the job

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 43
291/320177 02
082002/1237/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1    In Davis v. Microsoft, 109 Wn App 884, 37 P 3d 333 (2002), the Court of

2    Appeals recently affirmed partial summary judgment for the employer under

3    analogous circumstances  There, the plaintiff worked for Microsoft as a system

4    engineer, a position that required him to work 60-80 hours per week  The plaintiff

5    became unable to work the required hours due to a disability, and requested that

6    Microsoft accommodate him by allowing him to work 40 hours  Microsoft argued

7    that it was not required to change the plaintiff's work hours because 60-80 hours per

8    week was an essential function of the job, Microsoft demonstrated that all system

9    engineers worked 60-80 hours per week and the structure of the position did not

10   lend itself to a regular 40-hour work week  The Court of Appeals agreed and

11   affirmed the trial court's summary judgment that overtime was an essential function

12   of the job  Id at 892  Other courts have similarly upheld summary judgment where

13   an employee's disability prevented the employee from working scheduled hours or

14   meeting required attendance standards  Tyndall v. National Educ. Ctrs Inc of

15   Calif., 31 F 3d 209, 213 (4th Cir 1994) (an employee who cannot come to work

16   cannot perform any function, essential or otherwise), see also Barfield v. Bell South

17   Telecomms., Inc., 886 F Supp 1321, 1325 (S D Miss 1995) (regular and

18   predictable attendance is an essential function), Santiago v. Temple Univ., 739 F

19   Supp 974, 979 (E D Pa 1990) (attendance is necessarily the fundamental

20   prerequisite of any job)

21         Pursuant to these authorities, and for this additional reason, Allstate is

22   entitled to summary judgment on Temple's disability claims under the ADA and

23   WLAD

24   **VII.  TEMPLE'S "HOSTILE WORK ENVIRONMENT" CLAIM SHOULD BE DISMISSED.**

25

26         Temple also claims that Allstate created a "hostile work environment" for him

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE  WA  98154-1065
(206) 624-3600

after he allegedly opposed what he believed to be a violation of state and federal

laws   (Second Amended Complaint at ¶ 31.) The basis of this claim is unclear

However, it appears to be duplicative of other claims and should therefore be

dismissed for the reasons described above

### VIII.TEMPLE'S STATE TORT CLAIMS SHOULD BE DISMISSED.

Temple also makes the following claims under Washington law   (1) wrongful

discharge in violation of public policy, (2) intentional infliction of emotional distress,

(3) negligent infliction of emotional distress, and (4) negligent hiring, supervision

and retention "of its managers, supervisory employees, and other employees."

(Second Amended Complaint ¶ 46 )  For the reasons set forth below, Allstate is

entitled to summary judgment on these claims

### A.    Temple's Wrongful Discharge Claim is Duplicative of his Statutory Claims and Fails for the Same Reasons.

To prove wrongful discharge in violation of public policy, Temple must

demonstrate that his termination contravened a clear mandate of public policy

recognized judicially or legislatively   See Snyder, 145 Wn 2d at 238-39. Here, the

public policy at issue is found in the Washington Law Against Discrimination

Temple claims that his employment was terminated in violation of WLAD   Because

this is duplicative of his statutory claim under WLAD, it fails for the reasons

previously discussed in sections of this Brief addressing Temple's other claims

under WLAD

In addition, Temple's claim must be rejected because he cannot show any

causal connection between his age or disability and Allstate's decision to terminate

his employment   See, e g , Havens v  C & D Plastics, Inc , 124 Wn 2d 158, 178,

876 P 2d 435 (1994) (holding that plaintiff failed to produce enough evidence of

causal connection between policy linked conduct and dismissal to survive summary

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 45
291/320177 02
082002/1259/42496 00103

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600

1   judgment)  As discussed previously, Temple's employment was terminated

2   because Allstate made the business decision to terminate the employment of all of

3   its remaining employee agents  Allstate's decision applied equally to agents who

4   were younger than Temple, and to agents who did not have disabilities  There is

5   simply no evidence from which any reasonably jury could conclude that that

6   decision related in anyway to Temple's age or disability

## B.   The Evidence is Insufficient to Support a Claim for Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress (also known

as "Outrage"), a plaintiff must show (1) extreme and outrageous conduct that  (2)

intentionally or recklessly inflicts emotional distress, and (3) actually causes severe

emotional distress to the plaintiff   Dicomes v  State, 113 Wn 2d 612, 630, 782 P 2d

1002 (1989)  The plaintiff must prove that a defendant's conduct was "so

outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

civilized community "  Id  at 630  Whether conduct is sufficiently extreme and

outrageous generally is a fact question for the jury, but it is initially for a court to

determine as a matter of law whether reasonable minds could differ on whether the

conduct was sufficiently extreme to result in liability  Id

Washington courts readily dismiss outrage claims unless a defendant's

conduct is truly extreme  For example, when an employee's co-workers and

supervisors repeatedly insulted her over a period of nine months, referred to her as

"fucking bitch" and "cunt," demeaned her in front of customers and other

employees, screamed at her and subjected her to other forms of unpleasant and

demeaning conduct, this conduct "was not so extreme and outrageous as to be

regarded as atrocious or intolerable "  Robel v  Roundup Corp , 103 Wn  App  75,

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA 98154-1065
(206) 624-3600

1    78-81, 90, 10 P 3d 1104, review granted, 143 Wn 2d 1008 (April 10, 2001)

2    Here, Temple's evidence in support of this claim does not come close to

3    meeting this standard  While it is unclear exactly what evidence Temple intends to

4    rely upon, presumably he will argue that Allstate's insistence that he comply with

5    Agency Standards and its alleged mishandling of his or his in-laws insurance claims

6    support this claim  Even if true, this evidence plainly does not rise to the level of

7    "atrocious or intolerable" behavior  Consequently, Temple cannot establish the first

8    or second elements of this tort, and Allstate is entitled to summary judgment on this

9    claim  See Schonauer v  DCR Entm't, Inc , 79 Wn  App 808, 828, 905 P 2d 392

10   (1995) (affirming dismissal of outrage claim)

11   In addition, to the extent that the evidence Temple intends to rely upon in

12   support of this claim is the same evidence he cites in support of his other claims,

13   including his discrimination claims, this claim should be dismissed as duplicative

14   Anaya v  Graham, 89 Wn  App  588, 596, 950 P 2d 16 (1998) (affirming dismissal of

15   plaintiff's outrage claim because it is duplicative of discrimination claim under

16   WLAD)

17   **C.    Temple Has Not Stated a Claim for Negligent Infliction of Emotional**
     **Distress.**
18

19   As the Washington Supreme Court recently affirmed, employers do not owe

20   a duty to avoid inflicting emotional distress when dealing with employee disputes

21   Snyder, 145 Wn 2d at 252.  Accordingly, Washington courts will not recognize a

22   claim against an employer for negligent infliction of emotional distress that arises

23   from a workplace dispute or an employee disciplinary matter, or when the only

24   factual basis for emotional distress is the discrimination claim   Id , Robel, 102 Wn

25   App  at 90  Pursuant to these authorities, Temple's negligent infliction of emotional

26   distress claim should be dismissed

Defendant Allstate's Motion for Summary Judgment,
Case No  C01-5124 - Page 47
291/320177 02
082002/1259/42496 00103

1  **D.     Temple's Negligent Supervision and Retention Claims Should be
         Dismissed because they are Duplicative of His Discrimination Claims**

2

3       When a negligent supervision claim is based on the same facts as the

4  accompanying discrimination claims, the negligent supervision claim is duplicative

5  and should be dismissed  Francom, 98 Wn App at 864-65  The same rule applies

6  to a negligent retention claim  Id at 866  Consequently, this Court should dismiss

7  Temple's negligent supervision and retention claims

8                                   **IX.**
                              **CONCLUSION**

9       For all of the foregoing reasons, Allstate Insurance Company respectfully

10  asks the Court to dismiss all the Plaintiff's claims

11       DATED this 20th day of August, 2002

12                                   RIDDELL WILLIAMS P S

13

14                          By _____

15                             Karen F  Jones, WSBA #14987
                             Caitlin J  Moughon, WSBA #23184

16                             Laurence A  Shapero, WSBA #31301
                             Of Attorneys for Defendant Allstate

17                             Insurance Company

18

19

20

21

22

23

24

25

26

Riddell Williams P S
1001 FOURTH AVENUE PLAZA
SUITE 4500
SEATTLE, WA  98154-1065
(206) 624-3600